UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA,
ATLANTA DIVISION

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

JUN 14 2023

KEVIN P. WEIMER, Clerk
By: _____ Deputy Clerk

```
                                    )
TESSA G.,                           )
                                    )
          Plaintiff,                )
                                    )   CIVIL ACTION FILE NO.
                                    )   1:23-CV-2665
XAVIER BECERRA, Secretary,          )
UNITED STATES DEPARTMENT OF         )
HEALTH AND HUMAN SERVICES,          )   JURY TRIAL DEMANDED
                                    )
          Defendant.                )
                                    )
```

## **COMPLAINT**

Plaintiff Tessa G. (hereinafter "Plaintiff"), so pseudo-named by the EEOC Office of Federal Operations, respectfully files this Complaint under against Xavier Becerra, in his official capacity as Secretary of the U.S. Department of Health and Human Services (hereinafter "HHS", "Defendant," and/or "Agency").

## **INTRODUCTION**

1.      This Complaint is being brought as a result of HHS violating federal anti-discrimination laws discrimination in employment, rather than providing equal employment to individuals with disabilities and being a model employer for people with disabilities as required by federal law.

2.      This Complaint is also being brought for deprivation of Plaintiff's property and liberty interests without due process under the Fifth Amendment of the U.S. Constitution based on the

manner in which the Plaintiff was terminated and disparaged thereafter, without any notice or opportunity to be heard, irrespective of why HHS terminated Plaintiff.

## JURISDICTION and VENUE

3. Plaintiff submits herself to the jurisdiction of this Court.

4. Defendant is a governmental entity subject to suits of this kind. This Court has jurisdiction over Defendant.

5. This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331.

6. Plaintiff has exhausted her administrative remedies with respect to her claims under the Rehabilitation Act against the Defendant pursuant to 29 C.F.R. 1614.407(c).

7. Venue is proper in the United States District Court for the Northern District of Georgia, Atlanta Division, because most of the events giving rise to this Complaint occurred therein.

## THE PARTIES

### The Plaintiff

8. Plaintiff is an attorney with a background in public health. Plaintiff developed an interest in health law and policy by the time she started high school following an intense interest in public affairs. Plaintiff subsequently focused college coursework on health policy.

9. Plaintiff has been disabled nearly her entire life.

10. Among other conditions, Plaintiff has had epilepsy, several learning disabilities, a hearing impairment, as well as some other chronic medical conditions both neurological and non-

neurological in nature for nearly her entire life. Plaintiff spent nearly all of grade school in special education as a result of her disabilities.

11.     Subsequently, during college, Plaintiff had to take a leave of several years from school when her seizures became much more frequent and severe.

12.     Due to her increasingly-frequently seizures at that point, Plaintiff also had difficulty maintaining employment during and shortly after college; the jobs Plaintiff held at the time were largely retail and/or administrative in nature.

13.     After college and following surgical treatment of her seizures, Plaintiff attained long-term employment in positions entailing a combination of research, writing and administrative work. She soon thereafter enrolled in graduate school part-time, and attained full-time work in health policy.

14.     Plaintiff went on to earn dual advanced degrees in law and public health, focusing on policy. Among other honors and awards, Plaintiff received an award from a national health law society for her work at a health department during law school, which entailed identifying and establishing the legal foundations for several public health-related initiatives.

15.     Plaintiff held several positions related to health policy before, during, and after law school, prior to obtaining employment at the Agency/Defendant in spring 2013. The Agency/Defendant, through its official Matthew Penn, Plaintiff's supervisor, selected Plaintiff to work at the Agency/Defendant based in significant part on her prior work experience, along with the educational credentials Plaintiff held

16.    For several years until her employment with the Agency/Defendant, Plaintiff's seizures had abated, though Plaintiff has always continued to also deal with the effects of her other neurological disabilities; namely, these included the combination of Plaintiff's learning disabilities, especially her dyslexia, as well as her auditory difficulties, along with the (somewhat) "reduced bandwidth" resulting from her combined "neurodivergent" conditions.

17.    Notwithstanding the combination of her disabilities, Plaintiff was on a continued upward trajectory in her career at the intersection of public health and law when she began her employment with the Agency/Defendant.

18.    Following her (abrupt) termination from the Agency/Defendant after Plaintiff's epilepsy became known, Plaintiff was stigmatized by a record of termination from the Agency/Defendant, the CDC, and a scarred work history that encumbered Plaintiff's attempts to obtain alternative suitable employment related to her professional field.

19.    Multiple alternative potential employers that interviewed Plaintiff questioned her directly and/or staff at the Defendant/Agency, specifically about Plaintiff's termination from the Defendant/Agency, before declining to hire Plaintiff.

20.    Following the termination and retaliation at issue in this Complaint, Plaintiff developed multiple new disabilities and conditions, chiefly a severe sleep disorder, depression, high blood pressure, and chronic pain.

21.    Plaintiff is fully capable of and qualified to perform the essential functions of jobs similar to and including the position she held at the Agency/Defendant employer, especially with reasonable accommodations.

22.     However, there are many types of jobs in the national economy that would be unsuitable for Plaintiff due to a combination of her disabilities on the one hand, but also her specialized level of professional experience and educational training on the other.

23.     Following Plaintiff's difficulty locating employment related to her law and/or public health backgrounds subsequent to the Agency/Defendant terminating her, Plaintiff enrolled in a state vocational rehabilitation ("VR") program at the recommendation of a counselor in the Lawyer Assistance Program of a bar association.

24.     This was despite Plaintiff never needing help from a VR program to obtain employment before working at the Agency. That was prior to being stigmatized by a termination record following Plaintiff's disability disclosure.

25.     After Plaintiff enrolled in the VR program, the VR program in turn contracted with a headhunter to try locate employment for the Plaintiff.

26.     The headhunter reported to the Plaintiff and the VR case worker that employers that he had reached out to were not receptive to hiring a disabled worker at Plaintiff's level of education and experience, even with incentives offered by the VR program to incentivize the hiring of disabled workers. That was without any of those employers (contacted by the headhunter via the VR program) learning about Plaintiff's termination from the Agency/Defendant.

<u>The Defendant</u>

27.     Defendant is the Secretary of the United States Department of Health and Human Services ("HHS") and is sued in his official capacity. HHS is an executive agency, and an "employer" for purposes of the Rehabilitation Act.

28.     HHS is an arm of the federal government for purposes of the Fifth Amendment.

## ADMINISTRATIVE HISTORY

29.     After Plaintiff was abruptly removed from her position following the revelation of her

epilepsy to the Defendant/Agency, and the hiring and training of her (Plaintiff's) replacement

shortly thereafter, Plaintiff commenced the EEO process shortly after her termination by

contacting the Defendant's/Agency's EEO complaints manager in November 2014.

30.     In February 2015, Plaintiff filed a formal EEO complaint alleging that the

Agency/Defendant discriminated against her on the basis of her disability (epilepsy) in violation

of Section 501 of the Rehabilitation Act when it demoted Plaintiff by removing her from her

project manager position, when the Agency/Defendant thereafter directed ORISE to terminate

Plaintiff's employment at the Agency, and when the Agency/Defendant subsequently retaliated

against Plaintiff by disparaging her (Plaintiff) to others (individuals and/or alternative

employers) in her professional field of public health law and health policy, in turn impeding

Plaintiff's ability to locate alternative employment in her professional field.

31.     In May 2015, the Agency/Defendant dismissed Plaintiff's claims for demotion because it

was time-barred, and dismissed Plaintiff's retaliation claim because the Agency/Defendant

misconstrued Plaintiff's retaliation claim as arguing that her termination was retaliatory.

32.     Thereafter in May 2015, Plaintiff clarified to the Agency/Defendant's EEO complaints

manager that Plaintiff's basis for her retaliation claim was not that Plaintiff's termination itself

was retaliatory; but it was the Agency/Defendant's disparagement of Complainant to prominent

individuals and/or prospective alternative employers in Plaintiff's professional field/circles

following Plaintiff's termination, and the Agency/Defendant's interference with Plaintiff's

ability to locate alternative employment in her field, that was the basis of her retaliation claim.

33.     As initial evidence of such retaliation, Plaintiff described not just her significant

difficulty locating alternative employment compared to less difficulty she (Plaintiff) experienced

with her job searches prior to her employment at the Agency.

34.     Plaintiff also submitted to the Agency/Defendant's EEO investigator an email from a law

school professor informing her (Plaintiff) that Plaintiff's supervisor at the Agency/Defendant had

brought up to him (the professor) "the topic of you" (Plaintiff), and that he (Plaintiff's

supervisor) told the professor about Plaintiff's EEO activity. Thereafter, the professor stopped

meeting with or talking to Plaintiff. This was despite his (the professor's) close academic and

professional relationship with Plaintiff for over five years by then, and his (the professor) having

helped Plaintiff obtain several positions during and after law school, including Plaintiff's

position at the Agency.

35.     Following protracted administrative proceedings and noncompliance by the

Agency/Defendant, an Administrative Judge issued a default judgment on Plaintiff's part.

36.     Specifically, the AJ held the Defendant/Agency discriminated against the Plaintiff when

it terminated her because the Defendant/Agency had recruited and hired her (Plaintiff's)

replacement almost immediately, within few weeks, after the Defendant/Agency found out

Plaintiff has epilepsy, and while Plaintiff was on medical leave for her epilepsy.

37.     The AJ furthermore observed that similarly-situated workers, who held positions

identical to Plaintiff under the same supervisor of the Agency/Defendant but who were not

disabled, were not demoted or terminated after they exhibited performance issues similar to those

Plaintiff's supervisor at the Agency alleged were the "non-discriminatory" reasons for the

adverse employment actions at issue in this Complaint.

38.     The AJ moreover noted that Agency managers and staff discussed Plaintiff's epilepsy,

and expressed concern that her epilepsy might impact Plaintiff's work performance.

39.     In her ruling on the Agency's liability for discrimination, the AJ also officially reinstated

Plaintiff's retaliation claim. However, to this date, the Agency/Defendant did not conduct an

investigation of Plaintiff's retaliation claim, nor did the AJ permit discovery or full development

of the record regarding Plaintiff's retaliation claim.

40.     Throughout the administrative proceedings, the Agency/Defendant did not contest the

EEOC's/AJ's finding that the Agency/Defendant discriminated against the Plaintiff on the basis

of her disability (epilepsy) when it orchestrated the termination of Plaintiff's employment at the

Agency. The Agency/Defendant similarly did not appeal or contest any of the AJ's or EEOC's

decisions throughout the administrative processing of this Complaint.

41.     After the AJ's ruling holding that the Agency/Defendant discriminated against

Complainant on the basis of her disability when it removed her from her employment, the

Agency/Defendant, for the first time during the protracted administrative proceedings, alleged

that Plaintiff was not an "employee" of the Agency/Defendant, but rather that Plaintiff's position

was merely an "educational fellowship".

42.     The Agency/Defendant moreover argued that the AJ/EEOC should withhold most

equitable relief, namely reinstatement, full back pay and/or front pay, from Plaintiff because the

Agency/Defendant asserted Plaintiff would purportedly not have remained employed at the Agency/Defendant beyond her third contract term following two years of employment at the Agency/Defendant.

43.     Plaintiff set forth evidence demonstrating that she had a history of multiple contracts that were previously renewed; that is, before the Agency/Defendant found out about Plaintiff's epilepsy.

44.     Plaintiff moreover set forth evidence demonstrating that numerous similarly-situated individuals, initially hired into identical or nearly-identical "ORISE Fellow" positions by the same official at the Agency/Defendant under a series of "fixed-term" contracts, were repeatedly renewed over a continuous succession of contracts until they were ultimately shifted to permanent "federal employee" status at the Agency.

45.     Plaintiff further set forth evidence tending to show that as a proximate result of the stigma of her termination and/or the disparagement to which she was subjected by the federal government/Agency, she was denied alternative employment by other employers, including another federal agency, subsequent to her removal.

46.     After the AJ/EEOC denied most equitable relief and compensatory damages from Plaintiff notwithstanding all the evidence, Plaintiff appealed the AJ's decision to the OFO in August 2020.

47.     Although the OFO slightly increased its award of compensatory damages, in August 2022 the OFO upheld the denial of the majority of equitable relief based on what Plaintiff has maintained was an incomplete and/or inaccurate rendition of the full record.

48.     In August 2022, the OFO nonetheless remanded a portion of the Complaint back to the AJ to determine Plaintiff's entitlement to pecuniary damages.

49.     Thereafter, in September 2022, Plaintiff filed a Request for Reconsideration with the OFO, which the OFO denied on March 16, 2023.

50.     Subsequent to the OFO's August 2022 appellate decision, Plaintiff discovered a new witness and evidence further establishing that Defendant/Agency uses "ORISE Fellows" interchangeably with other contractor mechanisms, and that most individuals who begin working at Defendant/Agency as "ORISE Fellows" remain employed at the Defendant/Agency long-term.

51.     Based principally on her discovery of new evidence, on April 17, 2023, Plaintiff filed another "Request for Reconsideration" to the EEOC Commissioners.

52.     OFO responded to Plaintiff's new request via email and reiterated that Plaintiff had no further right of administrative Appeal or Reconsideration on the OFO's denial of further relief, despite the remanded portion of Plaintiff's claim for pecuniary damages to the AJ; the OFO expressly encouraged Plaintiff to bring her Complaint to federal court to seek further relief.

53.     Plaintiff has exhausted her administrative remedies, and now brings this Complaint.

## STATEMENT OF FACTS

<u>Hiring process for, and nature of, Plaintiff's "employment" at the CDC/Agency/Defendant</u>

54.     In March 2013, Plaintiff applied for a position of "ORISE Fellowship" via email submitted directly to the CDC's Public Health Law Program ("PHLP") in the Defendant/Agency, and addressed her application to Matthew Penn.

55.    Matthew Penn is a GS-15 federal employee, and has been the PHLP Director in the

Agency since approximately April 2011.

56.    In March 2013, shortly after Plaintiff applied for a position Mr. Penn and several Agency

staff interviewed Plaintiff. During the interview, Mr. Penn asked Plaintiff if she would be

prepared to move down to Atlanta for a "permanent" job.

57.    Several weeks thereafter in April 2013, Mr. Penn told Plaintiff he was still determining

the duration of the position he would offer Plaintiff based on funding availability.

58.    Several weeks thereafter, on April 18, 2013, Mr. Penn emailed Plaintiff to offer her "A

position as an ORISE Fellow with the Centers for Disease Control and Prevention, Office for

State, Tribal, Local and Territorial Support, Public Health Law Program." for four months.

59.    Mr. Penn noted in his offer [to Plaintiff] that, "Your experience and enthusiasm will be

an asset to our Center."

60.    Plaintiff promptly accepted the offer to Mr. Penn in April 2013.

61.    Plaintiff accepted Mr. Penn's job offer before she knew what projects she would work on.

62.    In May 2013, Mr. Penn again emailed Plaintiff to assign her first project to her, telling

her that she would be "aiding with" the updating of an ongoing assessment of laws by the CDC

addressing the epidemic of prescription drug overdose upon arriving at the Agency.

63.    Upon receiving the first work assignment from Mr. Penn, Plaintiff sought to clarify with

Mr. Penn whether her position was certain, because she [Plaintiff] had not yet received any

communication from ORISE confirming the administrative processing of her position with CDC.

64.     Mr. Penn replied to Plaintiff that the status of the ORISE approval and processing of her position was just "paperwork," and (again) referring to Plaintiff's position as a "job".

65.     Between April and May 2013, Mr. Penn and/or other managers of the Defendant/Agency directly sent Plaintiff background check and other administrative forms to complete prior to Plaintiff beginning to work at the Agency.

66.     In May 2013, Plaintiff went down to Atlanta, GA to meet Mr. Penn in person and to find housing before relocating to Atlanta to start working at the Defendant Agency.

67.     When Plaintiff met Mr. Penn in person for the first time in May 2013, he informed her that her second project, after assisting with the prescription drug overdose assessment, would be developing an assessment for the Division of Adolescent and School Health ("DASH").

68.     As of late May 2013, at which time Plaintiff moved her belongings down to Atlanta Plaintiff had still not received any communication from anyone at ORISE.

69.     Plaintiff relocated herself and her belongings down to Atlanta, GA in very late May 2013, entirely on the reassurances of Mr. Penn that Plaintiff had a "job" at the Agency/Defendant, irrespective of any ORISE approval or communication Plaintiff had still not yet received.

70.     Managers at the Agency/Defendant, namely Mr. Penn together with other personnel of the Agency/Defendant, arranged Plaintiff's June 2, 2013 start date directly with Plaintiff.

71.     It was after Plaintiff had arrived in Atlanta, GA and secured housing, on Friday, May 31, 2013, that Plaintiff received the very first communication from ORISE via email, confirming her "ORISE Fellowship" at the Agency/Defendant, and her monthly pay and health insurance.

72.     Managers at the Agency/Defendant, namely Mr. Penn together with the Agency's Human Resources Office, determined Plaintiff's monthly pay level, and directed ORISE to pay a specific monthly sum labeled a "stipend" to Plaintiff.

73.     The Agency/Defendant moreover directed ORISE to provide Plaintiff a certain level of health insurance coverage.

74.     The Agency/Defendant transferred funds to ORISE to cover Plaintiff's employment at the Agency.

75.     Plaintiff was required to provide specific services to the Agency/Defendant in exchange for her monthly remuneration.

76.     Plaintiff was required to provide specific services to the Agency/Defendant according to the instruction, manner, supervision, and feedback provided by Plaintiff's supervisor, Mr. Penn.

77.     At all times relevant to this Complaint, Agency managers and employees directly supervised and directed Plaintiff's work at the Agency/Defendant.

78.     At all times relevant to this Complaint, managers at the Agency/Defendant were authorized to discipline Plaintiff, including terminating her relationship with the Agency/Defendant.

79.     At all times relevant to this Complaint, Plaintiff's position with the Agency/Defendant was considered full-time, and she was not permitted to have other/additional employment.

80.     At all times relevant to this Complaint, the services provided by Plaintiff were an integral part of the Agency/Defendant's primary business.

81.    Whereas the Defendant Agency is located in Atlanta, Georgia, ORISE is located in Oak Ridge, Tennessee.

82.    ORISE does not have staff on site at the Defendant Agency.

83.    Plaintiff has never been supervised by anyone in/from ORISE.

84.    Plaintiff has never even met anyone from ORISE.

85.    Plaintiff has never received assignments or tools or equipment from ORISE.

86.    At all times relevant to this Complaint, HHS/CDC provided all the tools, equipment, resources, and facilities necessary for Plaintiff's work at and for Defendant/Agency.

87.    Contrary to the assertions by the Defendant, at all times relevant to this Complaint, Plaintiff was an employee of the Agency for purposes of the Rehabilitation Act.

## The facts leading to Plaintiff's discrimination Complaint

88.    Roughly two months after Plaintiff began working at Defendant/Agency, in approximately July 2013, Mr. Penn counseled Plaintiff on her need to work on being more concise in her communication.

89.    Also in July 2013, during a gathering in his office with Plaintiff and several other Agency managers and staff, including M.B. and M.R., Plaintiff witnessed Mr. Penn ridicule an intern (first initial "D") behind the intern's back based on D's (apparent) neurodivergent characteristics, laughing about how the intern was "so special".

90.    Plaintiff thus became further fearful of disclosing or making known her own neurodivergent-related disabilities.

14

91.     In September 2013, Mr. Penn told Plaintiff that he noticed improvement in Plaintiff's communication, and offered Plaintiff her first renewal for another eight months.

92.     In approximately early February 2014, Plaintiff shifted from working on the prescription drug overdose assessment, her first assigned project, to primarily beginning to develop her second project for DASH.

93.     In April 2014, Mr. Penn as well as other managers in Agency/Defendant reviewed, and expressed their approval of, Plaintiff's progress on her initial development of the DASH project.

94.     Subsequently in early May 2014, Mr. Penn offered Plaintiff a third contract term of employment at the Agency for a full year.

95.     On May 12, 2014, Mr. Penn signed off on Plaintiff's third contract term extension.

96.     Several days later in May 2014, Plaintiff disclosed her epilepsy to Mr. Penn following a (rare) seizure she had several weeks prior that involved a loss of consciousness.

97.     Plaintiff disclosed her epilepsy to request brief medical leave effective early June 2014 to receive follow-up testing and treatment for her epilepsy, and to inform Defendant/Agency of her need for an accommodation of rides to meetings offsite.

98.     Plaintiff also informed Mr. Penn that she (Plaintiff) was eligible for Schedule-A excepted hiring for people with disabilities.

99.     Mr. Penn responded by telling Plaintiff that he likes ORISE Fellows because [he] "could fire them whenever I need to".

100.    At the same meeting, Plaintiff asked Mr. Penn to evaluate her performance so plaintiff could gauge her strengths and weaknesses and know if/where she could improve.

101.    Thereafter, Multiple managers and staff in the Agency discussed Plaintiff's epilepsy on several occasions amongst themselves, and made comments to Plaintiff regarding their concern about Plaintiff's epilepsy and the effect it would potentially have on Plaintiff's performance.

102.    For example, one DASH project co-manager, L.S., asked Plaintiff if she (Plaintiff) would be able to care for herself in light of her seizures.

103.    While Plaintiff was out on medical leave in late spring, Mr. Penn and other managers at Defendant/Agency recruited and hired Plaintiff's (first) replacement (whose initials are L.A.).

104.    Following Plaintiff's return from her medical leave in mid-June 2014, Agency managers informed Plaintiff they had hired another person (L.A.) to work on (Plaintiff's) DASH project.

105.    Plaintiff had no involvement in interviewing, meeting, speaking with and/or selecting L.A. before she was hired, even though she (L.A.) was hired to work on the DASH project Plaintiff had single-handedly developed for several months prior.

106.    Although Agency managers did not initially tell Plaintiff the new hire would replace Plaintiff, one of the managers involved with selecting the new hire, M.R., told Plaintiff that L.A., the new hire would not get along with Plaintiff.

107.    Several weeks thereafter, when Plaintiff mentioned to M.R. that she (Plaintiff) needed to find a ride to another Agency campus to take care of some work tasks because she (Plaintiff) was unable to drive for a period due to her recent seizure, M.R. told Plaintiff that "People who work at the CDC need to have cars and drive; that's part of working at CDC."

108.     Also during approximately mid-summer 2014, Agency managers expressed aggravation when Plaintiff requested to postpone a meeting with Agency partners that she (Plaintiff) was scheduled to moderate because she (Plaintiff) felt lightheaded and at risk of an imminent seizure.

109.     The new "ORISE Fellow" Agency managers hired, L.A., who would apparently become Plaintiff's replacement, began her employment on August 11, 2014, a little over two months after she (L.A.) was recruited and hired, after re-locating from Seattle to Atlanta.

110.     On August 9, 2014, two days before L.A. began working at the Agency, Mr. Penn emailed the Complainant his approval of her recently-proposed PHLP-DASH project plan covering the next nine months.

111.     The first milestone/DASH project deliverable date listed was for the end of September 2014.

112.     Mr. Penn and Agency managers directed Plaintiff to train L.A. in the guise that she (L.A.) would "assist with" the DASH project.

113.     On or before September 11, 2014, Mr. Penn called L.A. and an intern who had also recently started working on the DASH project, in to meet with him (Mr. Penn) and another manager.

114.     Mr. Penn asked both L.A. and the intern "how things were going" with Plaintiff. When L.A. said negative things about Plaintiff, Mr. Penn told them (L.A. and the intern) that he "expected to hear that."

115.     At that meeting, Mr. Penn told L.A. and the intern that he would be removing Plaintiff from the DASH project, and that they would no longer work and/or communicate with Plaintiff.

116.    Mr. Penn told L.A. and the intern that he would be taking adverse action against Plaintiff before he (Mr. Penn) told Plaintiff there was anything wrong with her (Plaintiff's) performance.

117.    On September 11, 2014, Mr. Penn called Plaintiff into his office without prior notice and abruptly removed her from the DASH project.

118.    This was despite Mr. Penn not giving Plaintiff any negative feedback at all for over a year since he had told Plaintiff she (Plaintiff) needed to work on being more concise.

119.    At that meeting, Mr. Penn gave no reasons to Plaintiff for removing her from the DASH project, and did not tell Plaintiff what work she would perform from then onward.

120.    From September 11, 2014 onward until her termination, Plaintiff was marginalized.

121.    On September 22, 2014, Mr. Penn emailed several staff throughout the PHLP to solicit negative feedback regarding Plaintiff.

122.    In that email, Mr. Penn told the staff he was "behind with this."

123.    Those staff Mr. Penn had emailed to solicit negative feedback regarding Plaintiff had not worked with Plaintiff for over roughly eight months at that point.

124.    Late on September 30, 2014, several weeks after she was removed from the DASH project and marginalized, Mr. Penn emailed Plaintiff her first and only, and negative, performance review ("Review").

125.    The Review contained numerous general yet pervasive alleged performance problems that had never been raised before; and moreover consisted in significant part of criticizing Plaintiff's "neurodivergent" characteristics more common among people with disabilities such as Plaintiff's.

126.    The Review did not allege any change in Plaintiff's performance between the time Mr.

Penn issued it and when he offered and signed off on Plaintiff's two prior contract renewals.

127.    The Review was devoid of any incidents, examples, or specific performance expectations

that the Complainant had been required, but failed, to meet.

128.    Neither the Review nor email to which the Review was attached mentioned anything

about developing a performance improvement plan, or even any opportunity for, performance

improvement on Plaintiff's part.

129.    When the Complainant met with Mr. Penn on October 1, 2014, the day after Mr. Penn

issued the negative Review to discuss the Review, Mr. Penn again refused to cite any further

details such as specific incidents or examples of issues, or tell the Complainant what

performance expectations she would be expected to meet going forward.

130.    Several days later, in the evening on October 6, Mr. Penn told the Complainant that it

would "probably be helpful" to develop a "professional development plan."

131.    However, October 7, Mr. Penn cancelled his meeting with the Complainant for that

morning.

132.    Later in the evening of October 7, 2014, Mr. Penn emailed Plaintiff to (re)schedule the

meeting to discuss "professional development" for October 14, and requested that Plaintiff

formulate and send him a draft "professional development" plan before the meeting.

133.    Nevertheless, Mr. Penn continued to refuse to describe what expectations she (Plaintiff)

was required to meet, to enable Plaintiff to draft a "professional development" and/or

"performance improvement" plan.

134.   Plaintiff had previously requested, and Mr. Penn had previously approved, brief leave for just over a week, from October 8 until October 19, 2014 for observances with her family; Plaintiff had taken off the same time in fall 2013

135.   Plaintiff had thus requested to postpone the October 14, 2014 meeting because she was scheduled to be away then,.

136.   Plaintiff's postponement of the October 14 meeting and failure to develop a plan by that date, notwithstanding that Plaintiff was away on pre-approved leave, was a reason Mr. Penn cited for terminating Plaintiff from her employment.

137.   Early on October 20, the day Plaintiff returned to the office after her brief leave, Mr. Penn emailed several PHLP staff to ask if the Complainant had met with them "within the last 2-3 weeks."

138.   One PHLP senior analyst, L.C., reminded Mr. Penn that she (L.C.) thought Plaintiff was away during the prior few weeks.

139.   On October 23, 2014, three days after Plaintiff returned from brief leave, Mr. Penn emailed ORISE and demanded that Plaintiff be terminated.

140.   In the email to ORISE directing Plaintiff's termination, Mr. Penn told ORISE that, "[N"]N one wants to work with her."

141.   Nevertheless, Mr. Penn continued to assign smaller work tasks to Plaintiff to complete.

142.   Plaintiff continued to submit work products to Mr. Penn through November 4, 2014, at which point Plaintiff became ill.

143.    On November 7, 2014, while Plaintiff was out for a few days due to illness, Plaintiff received a letter from ORISE via email informing her (Plaintiff) that her "fellowship" position had been terminated effective two days prior, on November 5, 2014.

144.    ORISE gave no reason for Plaintiff's termination in its November 7, 2014 letter.

145.    Plaintiff was given no prior notice, nor any form of hearing or due process, prior to her termination.

146.     Plaintiff commenced the EEO process with Defendant Agency on November 21, 2014.

147.    On December 22, 2014, Plaintiff separately sent a letter to ORISE claiming that her termination was discriminatory.

148.    In March 2015, ORISE, through its counsel, sent a reply letter to Plaintiff  generally denying discrimination.

149.    In that March 2015 letter, ORISE informed Plaintiff that they (ORISE) on three (3) occasions urged the Defendant/Agency to transfer Plaintiff to a different division/department within the Agency for the remainder of her third contract term, in lieu of terminating Plaintiff, but that the Defendant Agency refused.

150.    Neither ORISE nor the Defendant Agency have described what specific expectations Plaintiff was required to and/or failed to meet.

151.    Neither ORISE nor the Defendant/Agency explained why it was necessary to terminate without any, even one day's, prior notice.

152.    When the Defendant/Agency had terminated another ORISE Fellow working under Mr. Penn in approximately April 2014, M.B., she (M.B.) was given at least three weeks prior notice in a public email sent to the PHLP division thanking her (M.B.) for her service.

153.    Another PHLP manager (M.R.) told Plaintiff soon after M.B.'s termination that M.B. was allegedly terminated for lying about her (M.B.'s) work hours/status.

154.    In that same affidavit, in response to a question from the EEO investigator about whether it was typical for ORISE fellows to be terminated without notice like Plaintiff was, Mr. Penn replied he was "[N]ot sure if that is how terminations from ORISE usually work."

155.    Several paragraphs below, in that same affidavit, Mr. Penn nevertheless stated that "ORISE went in a different direction with" Plaintiff by not giving her (Plaintiff) notice compared to the termination of M.B. roughly a half year prior.

156.    In that same August 13, 2015, affidavit, in response to a question from the EEO investigator to explain the allegation that Mr. Penn had "badmouthed" Plaintiff to others after her termination, Mr. Penn stated, "I do not recall conversations where I said anything negative about [Plaintiff] outside the people involved in her work or termination."

157.    Plaintiff had (previously) submitted to the EEO investigator an email from a law school professor, dated January 2015, informing her (Plaintiff) that Mr. Penn had brought up to him (the professor) "the topic of you" (Plaintiff), and that Mr. Penn had told the professor about Plaintiff's EEO activity.

158.   In his affidavit dated August 13, 2015, well over a year after he first found out about Plaintiff's epilepsy, Mr. Penn, a GS-15 official in the CDC who has worked under a physician, stated that, "I do not have a good understanding of what epilepsy is or what it does to people."

159.   Mr. Penn stated in his August 13, 2015 affidavit that the second reason he demanded Plaintiff's termination was because Plaintiff purportedly "missed deadlines."

160.   Plaintiff did not miss any project deadlines; her first project deadline/milestone after she drafted and submitted her 2014-2015 project plan prior to L.A. beginning at the Agency, was in late September 2015. That deadline was after Plaintiff was removed from her project.

161.   Prior to her removal from the DASH project on September 11, 2014, Plaintiff had worked on the DASH project for no more than eight months; Plaintiff had worked on the prescription drug assessment project with A.M. for the prior approximately eight months.

162.   After Plaintiff's removal from the DASH project and soon thereafter the Agency, the DASH assessment and project fell several years behind.

163.   One of the non-disabled comparators Plaintiff cited in her 2015 EEO Complaint, A.M., repeatedly fell behind in her (prescription drug assessment) project that she (A.M.) began working on in 2012, but was not demoted nor terminated.

164.   Other fellows and interns had specifically indicated to Plaintiff between 2013 and approximately early 2014, while Plaintiff was still working on the prescription drug project, that A.M. had communication difficulties and thus sought clarification on instructions for the prescription drug project from Plaintiff.

165.    Nevertheless, A.M. shifted from four ORISE renewals between April 2012 and August 2015, to other contracts through Agency contractors other than ORISE, and then to permanent federal employment in 2019.

166.    Another non-disabled comparator Plaintiff cited in her original Complaint, G.S., was told by Mr. Penn within two months of beginning at the Agency, at approximately the same time as Plaintiff, that he (G.S.) needed to improve his performance.

167.    Unlike the Plaintiff, G.S. was given specific feedback on how he needed to improve, and was given several months to work on improvement.

168.    Like A.M., G.S. had his contracts via ORISE renewed several times before shifting to other Agency contracts.

169.    After multiple renewals of their ORISE contract periods, A.M., G.S., as well as multiple other similarly-situated workers, were shifted, specifically at the Agency's/Defendant's request and arrangement, to other Agency contracts.

170.    Thereafter, after first being hired as ORISE fellows and renewed across multiple contracts, A.M., G.S. and numerous similarly-situated workers were ultimately transitioned to permanent federal employment at the Agency/Defendant once federal slots became available.

171.    In June 2016, less than two years after Plaintiff's removal following the revelation of her epilepsy, an audit of the Agency/Defendant conducted by Korn Ferry found that, "Employees with a disability tended to be significantly less favorable compared to able bodied employees overall..."

172.    The same Korn Ferry audit found that, "CDC allows employees to be discriminated against, for their disabilities. They allow managers to harass, bully and retaliate against employees who fight for their rights that are being violated."

173.    The following year, in 2017, there was public reporting regarding widespread claims of discrimination and retaliation at the Defendant Agency.

## LEGAL CLAIMS

### COUNT I:  DISCRIMINATORY DISCHARGE IN VIOLATION OF THE REHABILITATION ACT.

174.    Plaintiff incorporates by reference all preceding paragraphs of this Complaint.

175.    At all times relevant to this Complaint, Plaintiff is a person with a disability under the Rehabilitation Act.

176.    Epilepsy is expressly enumerated as a covered disability under the regulations implementing the Americans with Disabilities Amendment Act of 2008.

177.    At all times material to this Complaint, Plaintiff was in fact an "employee" of the Agency/Defendant for purposes of the Rehabilitation Act, contrary to the Defendant/Agency's contentions otherwise.

178.    At all times relevant to this Complaint, Plaintiff was, and still is, qualified for the position she held from which she was terminated, with or without reasonable accommodations.

179.    Plaintiff's qualification for the position from which she was terminated is evidenced by her (Plaintiff's) being hired based expressly on her professional experience and educational attainment, and the Defendant/Agency twice renewing Plaintiff's contracts, for three terms, prior to Plaintiff revealing her epilepsy.

180.     Defendant/Agency violated the Rehabilitation Act by terminating Plaintiff due to her disability, instead of accommodating her disability.

181.     The reasons asserted by Defendant Agency for Plaintiff's discharge are false and pretext for disability discrimination.

182.     Defendant, through its agents, acted willfully, wantonly, intentionally and in reckless and callous disregard of Plaintiff's federally protected rights.

183.     As a direct and proximate result of Defendant's conduct, Plaintiff is entitled to both equitable and monetary relief including, but not limited to, reinstatement or front pay, full back pay, compensatory damages, pre-judgment interest, attorneys' fees and litigation costs.

184.     As a direct and proximate result of Defendant's conduct, Plaintiff has been deprived of the opportunity to remain in her chosen profession and advance in her career and profession; income in the form of wages; as well as other benefits of employment.

## COUNT II:  FAILURE TO ACCOMMODATE IN VIOLATION OF THE REHABILITATION ACT.

185.     Plaintiff incorporates by reference all preceding paragraphs of this Complaint.

186.     At all times relevant to this Complaint, Plaintiff is a person with a disability under the Rehabilitation Act.

187.     Despite being aware that Plaintiff is a person with disability, Defendant Agency refused to accommodate Plaintiff, and did not even engage in the interactive process to determine if an accommodation was necessary; they instead wrongfully demoted and then terminated Plaintiff as a result of her disability.

188.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered

profound harm to her career and lifetime earnings; emotional and physical pain and suffering;

inconvenience, mental anguish, loss of enjoyment of life, and other past and future pecuniary and

non-pecuniary losses.

## COUNT III:  RETALIATION IN VIOLATION OF THE REHABILITATION ACT.

189.    Plaintiff incorporates by reference all preceding paragraphs of this Complaint.

190.    At all times relevant to this Complaint, Plaintiff is a person with a disability under the

Rehabilitation Act.

191.    Plaintiff engaged in protected activity by filing an EEO claim.

192.    Defendant/Agency further violated the Rehabilitation Act by retaliating against Plaintiff

for engaging in EEO activity following her termination, by disparaging Plaintiff to other

individuals and/or employers in her professional field thereby interfering with Plaintiff's ability

to obtain suitable alternative employment following her termination.

193.    As a direct and proximate result of Defendant's retaliatory actions, Plaintiff suffered

damages consisting of, but not limited to, lost wages and other benefits of employment,

emotional distress, mental anguish, humiliation and pain and suffering.

194.    Defendant engaged in its retaliatory conduct intentionally and/or with malice and/or

reckless indifference to the rights of Plaintiff.

195.    The foregoing actions of Defendant caused Plaintiff mental anguish, loss of dignity and

other intangible injuries.

196.    Plaintiff has suffered profound, long-term professional, economic, financial, social,

familial, personal, emotional, and physical harm due to Defendant's violation of the Act.

197.    Defendant acted with malice toward Plaintiff, therefore justifying an award of punitive

damages in addition to equitable and compensatory relief.

## COUNT IV:  ILLEGAL DISCLSOURE IN VIOLATION OF THE REHABILITATION ACT.

198.    Plaintiff incorporates by reference all preceding paragraphs of this Complaint.

199.    At all times relevant to this Complaint, Plaintiff is a person with a disability under the

Rehabilitation Act.

200.    Defendant violated the Rehabilitation Act by discussing and disclosing, via Mr. Penn

and/or other Defendant/Agency managers/staff, Plaintiff's medical condition/disability (epilepsy)

to individuals to whom Plaintiff did not disclose it.

201.    Plaintiff has suffered profound, long-term professional, emotional, economic, financial,

reputational, social,  personal, and physical harm, and loss of dignity, due to Defendant's

violation of the Act.

202.    Defendant acted with malice toward Plaintiff, therefore justifying an award of punitive

damages in addition to equitable and compensatory relief.

## COUNT V:

### Deprivation of Due Process in Violation of the Fifth Amendment of the U.S. Constitution

203.    Plaintiff incorporates by reference all preceding paragraphs of this Complaint.

204.  At the specific direction of the Agency/Defendant, an arm of the federal government, Plaintiff was both hired and terminated by the federal government via its contractor ORISE.

205.  At the direction of the Agency/Defendant, Plaintiff was employed under a series of "fixed-term" contracts, each term containing a specific end date.

206.  The contract terms under which ORISE hired Plaintiff on behalf of the Agency/Defendant stated that Plaintiff would only be terminated before the specified end date in each successive contract period if she (Plaintiff) did not meet the "expectations" of her appointment .

207.  Plaintiff thus had a property interest in her position/employment at the Agency/Defendant that Agency/Defendant could not deprive Plaintiff of without notice and an opportunity to be heard.

208.  Despite her right to due process, Plaintiff was terminated from her employment without any notice, even of one day, prior to her termination.

209.  Plaintiff was not given any opportunity to be heard before, or even shortly after, her termination, and was not even provided with specific grounds for her termination.

210.  Plaintiff also had a liberty interest in being able to pursue employment in her chosen field, as well as a career with the federal government, the largest employer in the U.S., without being obstructed therefrom by stigma and damage to her good name and reputation as a result of a termination and/or disparagement to others, without due process.

211.    Nevertheless, despite Plaintiff's Constitutional Due Process rights, the Agency/Defendant deprived her of her property and liberty interests in her ability to seek employment with the federal government, and even outside the federal government in her field more broadly.

212.    As a result of the Agency/Defendant depriving Plaintiff of her due process rights, Plaintiff was deprived, without any due process, of her liberty interest in freely pursuing her career and employment with the largest U.S. employer, the federal government.

213.    After her termination, several employers, including another federal agency, questioned the Plaintiff as well as staff at the Defendant Agency, about her termination from the Agency and thereafter declining to hire Plaintiff after inquiring about her termination from the Agency/Defendant; this followed multiple interviews with Plaintiff, discussing start dates, and conducting background checks.,.

214.    After Plaintiff was unable to locate alternative employment with other federal agencies and/or other contractors serving the Defendant/Agency following the revelation of her termination, a human resources official within the Washington, DC headquarters of HHS, initials K.W., in August 2015 conveyed to Plaintiff's career counselor via email that she (Plaintiff) would likely have more difficulty locating federal employment as a result of her (Plaintiff's) record of termination from the Defendant/Agency, even as an "ORISE Fellow".

215.    Despite applying to dozens of positions inside and outside the federal government, each time another prospective employer found out about Plaintiff's termination from the Agency/Defendant and/or was asked to provide Mr. Penn's contact information during and/or following interviews, Plaintiff was not hired by those employers.

216.    Plaintiff was deprived of both her property interest, as well as being encumbered from her ability to seek and qualify for federal employment with the largest U.S. employer, and even her ability to obtain suitable employment commensurate with her experience, education and professional interests more broadly, as a result of being terminated and stigmatized by the federal government without due process.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands a TRIAL BY JURY and the following relief:

(A)    Declaratory judgment that Defendant violated Plaintiff's rights under the federal statutes and U.S. Constitution as listed above;

(B)    A permanent injunction against Defendant/Agency generally, and Matthew Penn specifically, from additional violations of federal laws and from further disparagement of Plaintiff;

(C)    Reinstatement to a substantially similar position from which Plaintiff was terminated, similar based on the nature of the work and duties Plaintiff performed prior to her termination, but in a different division/department of the Agency/Defendant free of Mr. Penn's interference, and/or reinstatement into another alternative position otherwise mutually agreed upon by both the Plaintiff and Agency/Defendant;

(D)    Indefinite front pay in lieu of reinstatement in the event reinstatement is entirely and truly impossible, to compensate Plaintiff for lost future wages, benefits, and a pension;

(E)    Full back pay from the date of Plaintiff's termination, including all raises and step increases, and fringe benefits, with prejudgment interest, to which Plaintiff would have been

entitled based on what has been earned by her similarly-situated workers and/or what Plaintiff would have earned in alternative federal employment she was denied following the revelation of her termination. The back pay amount awarded by this court may be offset by the limited back pay portion awarded by the AJ during the administrative process;

(F)     Full and maximum compensatory as well as pecuniary damages, in an amount to be determined by an enlightened jury;

(G)     An award of pre-judgment interest;

(H)     An award of additional relief and damages to be determined by an enlightened jury in order to most completely make Plaintiff truly whole, and to deter Defendant/Agency from similar conduct in the future;

(I)     Reasonable attorney's fees and costs;

(J)     Appropriate injunctive relief requiring the Agency/Defendant to create Agency-wide programs and/or systems to facilitate better management awareness, as well as inclusion and/or accommodation, of individuals with, diverse disabilities, including but not limited to neurodivergent conditions.

(K)     Any other such equitable, monetary, injunctive, and declaratory relief as the Court deems just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Respectfully submitted June 14, 2023,

███████████ a/k/a Tessa G.

entitled based on what has been earned by her similarly-situated workers and/or what Plaintiff would have earned in alternative federal employment she was denied following the revelation of her termination. The back pay amount awarded by this court may be offset by the limited back pay portion awarded by the AJ during the administrative process;

(F)    Full and maximum compensatory as well as pecuniary damages, in an amount to be determined by an enlightened jury;

(G)    An award of pre-judgment interest;

(H)    An award of additional relief and damages to be determined by an enlightened jury in order to most completely make Plaintiff truly whole, and to deter Defendant/Agency from similar conduct in the future;

(I)    Reasonable attorney's fees and costs;

(J)    Appropriate injunctive relief requiring the Agency/Defendant to create Agency-wide programs and/or systems to facilitate better management awareness, as well as inclusion and/or accommodation, of individuals with, diverse disabilities, including but not limited to neurodivergent conditions.

(K)    Any other such equitable, monetary, injunctive, and declaratory relief as the Court deems just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Respectfully submitted June 14, 2023,

/.                         a/k/a Tessa G.

| | |
|---|---|
| *Mailing address*: | c/o Pamela S. Gillis Gilbertz |
| | 208 Stonecutters Walk |
| | Stockbridge, GA 30281 |
| *Email*: | alias.tessa.g@gmail.com |
| *Phone*: | 404-939-2076 |

"Right to Sue" 90-day issued 3/16/23



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Office of Federal Operations**
**P.O. Box 77960**
**Washington, DC 20013**

~~Tessa G.~~, a/k/a
Tessa G.,[1]
Complainant,

v.

Xavier Becerra,
Secretary,
Department of Health and Human Services
(Centers for Disease Control and Prevention),
Agency.

Request No. 2023000076

Appeal No. 2020004613

Agency No. HHS-CDC-0100-2015

DECISION ON REQUEST FOR RECONSIDERATION

Complainant timely requested that the Equal Employment Opportunity Commission (EEOC or Commission) reconsider its decision in EEOC Appeal No. 2020004613 (August 29, 2022). EEOC regulations provide that the Commission may, in its discretion, grant a request to reconsider any previous Commission decision issued pursuant to 29 C.F.R. § 1614.405(a), where the requesting party demonstrates that: (1) the appellate decision involved a clearly erroneous interpretation of material fact or law; or (2) the appellate decision will have a substantial impact on the policies, practices, or operations of the agency. See 29 C.F.R. § 1614.405(c).

On February 10, 2015, Complainant filed a formal EEO complaint alleging that her termination, from her Legal Analyst position with the Agency's Oak Ridge Institute for Science and Education (ORISE), was discriminatory.

---

[1] This case has been randomly assigned a pseudonym which will replace Complainant's name when the decision is published to non-parties and the Commission's website.

2                                                    2023000076

While her case was pending a hearing with an EEOC Administrative Judge (AJ), the Agency did not provide her with a copy of the report of investigation until more than six months after the deadline set by the assigned AJ.  Over the Agency's objections, Complainant's motion for the sanction of default judgment was granted.  The AJ reasoned that default judgment was warranted because of the extreme length of the delay, the resulting harm to Complainant, and the Agency's disregard for the EEO process.  The AJ also found that Complainant established a prima facie case of disability discrimination when, soon after she told her supervisor she had epilepsy, the supervisor hired someone to replace her while she was on medical leave, then demoted her, before ultimately terminating her, even though he had not previously cited any deficiencies in her performance. The Agency was found liable for damages.

In the June 8, 2020 Damages Decision, the AJ awarded Complainant: $42,500 in non-pecuniary compensatory damages, backpay for the remaining time on her contract, and attorney's fees. The AJ did not address Complainant's request for pecuniary compensatory damages, or discipline and training.

On appeal, the parties did not dispute the issuance of the default judgment.  The appellate decision was therefore limited to the AJ's award of remedies.

In EEOC Appeal No. 2020004613, the Commission agreed with the Agency that Complainant was not entitled to reinstatement, as her position was part of a fellowship program with a term contract.  Because Complainant was not entitled to reinstatement, the Commission found that the AJ's award of backpay, for the months remaining on her contract ($37,947 plus interest) was appropriate.  Regarding non-pecuniary compensatory damages, the Commission found that an increased award of $75,000 was more appropriate.  In so doing, the appellate decision noted that Complainant testified that her former professor was unwilling to assist her in her job search following her termination, citing her EEO litigation.  Complainant also described panic attacks and physical pain that her physician attributed to severe stress and depression.  With respect to pecuniary damages, the matter was remanded to the AJ.  The Agency was also ordered to provide training, post a notice regarding the finding of discrimination, and consider discipline for the responsible officials.

In her request for reconsideration, Complainant reiterates her contention that she should have been granted reinstatement to a permanent position.  In so doing, Complainant argues the Commission should have required the Agency to show why she was not eligible for reinstatement via another mechanism if the ORISE program was no longer available. Additionally, Complainant delves into the analysis for determining whether an individual is an employee to argue that she is entitled to placement in a permanent position.  According to Complainant, she likely would have remained employed with the Agency past the expiration of her third contract, citing a comparator in her fourth year as an ORISE fellow.  Complainant asserts that the Agency has shown that a monetary award will not deter it from engaging in discrimination and urges the Commission order her reinstatement into a permanent position.

Regarding the award of non-pecuniary compensatory damages, Complainant argues that the Commission downplayed her new severe and chronic medical conditions that followed her termination.

In order to merit the reconsideration of a prior Commission decision, the requesting party must submit written argument or evidence which tends to establish that at least one of the criteria of 29 C.F.R. §1614.407(c) is met. The Commission's scope of review on a request for reconsideration is narrow. Lopez v. Department of the Air Force, EEOC Request No. 05890749 (September 28, 1989). A request for reconsideration is not merely a form of a second appeal. Regensberg v. USPS, EEOC Request No. 05900850 (September 7, 1990). Instead, it is an opportunity to submit newly discovered evidence, not previously available; to establish substantive error in a previous decision; or to explain why the previous decision will have effects beyond the case at hand. Lyke v. USPS, EEOC Request No. 05900769 (September 27, 1990). Complainant has not done so here. Rather, she has simply reasserted her belief that she should be granted a permanent position with the Agency.

After reviewing the previous decision and the entire record, the Commission finds that the request fails to meet the criteria of 29 C.F.R. § 1614.405(c), and it is the decision of the Commission to DENY the request. The decision in EEOC Appeal No. 2020004613 remains the Commission's decision and the Agency shall comply with its Order as repeated below. There is no further right of administrative appeal on the decision of the Commission on this request.

<u>ORDER</u>

The Agency is ordered to take the following remedial actions:

1. To the extent the Agency has not already done so, within 60 days of the date this decision is issued, the Agency is ordered to pay Complainant back pay in the amount of $37,947, plus interest. If there is a dispute regarding the exact amount of back pay and/or benefits, the Agency shall issue payment to Complainant for the undisputed amount within 60 calendar days of the date the Agency determines the amount it believes to be due. Complainant may petition for enforcement or clarification of the amount in dispute regardless of whether she accepts the Agency's payment. The petition for clarification or enforcement must be filed with the Compliance Officer, at the address referenced in the statement entitled "Implementation of the Commission's Decision."

2. The issue of Complainant's increased tax burden from the Agency's lump sum payment of back wages is remanded to the Agency. On remand, the Agency shall conduct a supplemental investigation, including providing Complainant an opportunity to submit evidence of her increased tax burden. The Agency shall complete the investigation and issue a final agency decision appealable to the EEOC determining the appropriate amount of damages.

4                                          2023000076

3. To the extent the Agency has not already done so, within 60 days of the date this decision is issued, the Agency is ordered to pay Complainant the amount of $41,834 and $1,193.50 in attorneys' fees and costs.

4. To the extent it has not already done so, within 60 days of the date this decision is issued, the Agency shall pay Complainant $75,000 in nonpecuniary, compensatory damages.

5. To the extent it has not already done so, within 120 days of the date this decision is issued, the Agency shall consider taking disciplinary action(s) against the management official(s) identified as being responsible for the unlawful discrimination perpetrated in this case. The Agency shall report its decision to the Commission. If the Agency decides to take disciplinary action, it shall identify the action taken. If the Agency decides not to take disciplinary action, it shall set forth the reason(s) for its decision not to impose discipline.

6. To the extent it has not already done so, within 90 days of the date this decision is issued, the Agency shall provide four (4) hours of live training with a focus on the Rehabilitation Act and reprisal to Director and other managers and supervisors of the Office of State Tribal Local and Territorial Support in Atlanta, Georgia.

7. To the extent it has not already done so, within sixty (60) calendar days after the date this decision becomes final, the Agency shall provide training to the responsible EEO management officials who processed this complaint on their responsibilities concerning case processing, sending the investigative file to Complainant in a timely manner, and their duty to comply with orders from the Commission.

8. To the extent it has not already done so, the Agency shall, within 30 calendar days of the date this decision is issued, forward the matter to the EEOC's Atlanta District Office's Hearings Unit, so that the issues of Complainant's entitlement to pecuniary damages can be addressed by the AJ.

9. To the extent it has not already done so, the Agency shall immediately post a notice in accordance with the paragraph below.

The Agency is further directed to submit a report of compliance in digital format as provided in the statement entitled "Implementation of the Commission's Decision." The report shall be submitted via the Federal Sector EEO Portal (FedSEP). See 29 C.F.R. § 1614.403(g). Further, the report must include supporting documentation of the Agency's calculation of back pay and other benefits due Complainant, including evidence that the corrective action has been implemented.

5                                                                         2023000076

## POSTING ORDER (G0617)

The Agency is ordered to post at its facility at the Office of State Tribal Local and Territorial Support in Atlanta, Georgia, copies of the attached notice. Copies of the notice, after being signed by the Agency's duly authorized representative, shall be posted **both in hard copy and electronic format** by the Agency within 30 calendar days of the date this decision was issued, and shall remain posted for 60 consecutive days, in conspicuous places, including all places where notices to employees are customarily posted. The Agency shall take reasonable steps to ensure that said notices are not altered, defaced, or covered by any other material. The original signed notice is to be submitted to the Compliance Officer as directed in the paragraph entitled "Implementation of the Commission's Decision," within 10 calendar days of the expiration of the posting period. The report must be in digital format, and must be submitted via the Federal Sector EEO Portal (FedSEP). See 29 C.F.R. § 1614.403(g).

## IMPLEMENTATION OF THE COMMISSION'S DECISION (K0719)

Under 29 C.F.R. § 1614.405(c) and §1614.502, compliance with the Commission's corrective action is mandatory. Within seven (7) calendar days of the completion of each ordered corrective action, the Agency shall submit via the Federal Sector EEO Portal (FedSEP) supporting documents in the digital format required by the Commission, referencing the compliance docket number under which compliance was being monitored. Once all compliance is complete, the Agency shall submit via FedSEP a final compliance report in the digital format required by the Commission. See 29 C.F.R. § 1614.403(g). The Agency's final report must contain supporting documentation when previously not uploaded, and the Agency must send a copy of all submissions to the Complainant and his/her representative.

If the Agency does not comply with the Commission's order, the Complainant may petition the Commission for enforcement of the order. 29 C.F.R. § 1614.503(a). The Complainant also has the right to file a civil action to enforce compliance with the Commission's order prior to or following an administrative petition for enforcement. See 29 C.F.R. §§ 1614.407, 1614.408, and 29 C.F.R. § 1614.503(g). Alternatively, the Complainant has the right to file a civil action on the underlying complaint in accordance with the paragraph below entitled "Right to File a Civil Action." 29 C.F.R. §§ 1614.407 and 1614.408. A civil action for enforcement or a civil action on the underlying complaint is subject to the deadline stated in 42 U.S.C. 2000e-16(c) (1994 & Supp. IV 1999). **If the Complainant files a civil action, the administrative processing of the complaint, including any petition for enforcement, will be terminated.** See 29 C.F.R. § 1614.409.

Failure by an agency to either file a compliance report or implement any of the orders set forth in this decision, without good cause shown, may result in the referral of this matter to the Office of Special Counsel pursuant to 29 C.F.R. § 1614.503(f) for enforcement by that agency.

6                                          2023000076

## COMPLAINANT'S RIGHT TO FILE A CIVIL ACTION (P0610)

This decision of the Commission is final, and there is no further right of administrative appeal from the Commission's decision. You have the right to file a civil action in an appropriate United States District Court **within ninety (90) calendar days** from the date that you receive this decision. If you file a civil action, you must name as the defendant in the complaint the person who is the official Agency head or department head, identifying that person by his or her full name and official title. Failure to do so may result in the dismissal of your case in court. "Agency" or "department" means the national organization, and not the local office, facility or department in which you work.

## RIGHT TO REQUEST COUNSEL (Z0815)

If you want to file a civil action but cannot pay the fees, costs, or security to do so, you may request permission from the court to proceed with the civil action without paying these fees or costs. Similarly, if you cannot afford an attorney to represent you in the civil action, you may request the court to appoint an attorney for you. **You must submit the requests for waiver of court costs or appointment of an attorney directly to the court, not the Commission.** The court has the sole discretion to grant or deny these types of requests. Such requests do not alter the time limits for filing a civil action (please read the paragraph titled Complainant's Right to File a Civil Action for the specific time limits).

FOR THE COMMISSION:

Carlton M. Hadden, Director
Office of Federal Operations


March 16, 2023
Date



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Office of Federal Operations**
**P.O. Box 77960**
**Washington, DC 20013**

Tessa G.,[1]
Complainant,

v.

Xavier Becerra,
Secretary,
Department of Health and Human Services
(Centers for Disease Control and Prevention),
Agency.

Appeal No. 2020004613

Hearing No. 410-2015-00312X

Agency No. HHS-CDC-0100-2015

## DECISION

On August 17, 2020, Complainant filed an appeal with the Equal Employment Opportunity Commission (EEOC or Commission), pursuant to 29 C.F.R. § 1614.403(a), from an Equal Employment Opportunity Commission Administrative Judge's (AJ) June 8, 2020, final order concerning damages on her equal employment opportunity (EEO) complaint alleging employment discrimination in violation of Section 501 of the Rehabilitation Act of 1973 (Rehabilitation Act), as amended, 29 U.S.C. § 791 et seq. For the following reasons, the Commission MODIFIES in part the AJ's final order and REMANDS the case to the Agency for further proceedings consistent with this decision.

## BACKGROUND

At the time of events giving rise to this complaint, Complainant worked as a Legal Analyst, Oak Ridge Institute for Science and Education (ORISE) at the Agency's Office of State Tribal Local and Territorial Support in Atlanta, Georgia.

---

[1] This case has been randomly assigned a pseudonym which will replace Complainant's name when the decision is published to non-parties and the Commission's website.

On February 10, 2015, Complainant filed an EEO complaint alleging that the Agency discriminated against her on the bases of disability (epilepsy) and reprisal for prior protected EEO activity under Section 501 of the Rehabilitation Act of 1973 when, on November 6, 2014, she was terminated from her position of Legal Analyst, Oak Ridge Institute for Science and Education (ORISE) Fellow.

Complainant requested a hearing. The Agency did not provide Complainant with a copy of the report of investigation until March 10, 2016, more than six months after the deadline established by one Equal Employment Opportunity Commission Administrative Judge in an Order Directing Agency to Produce an Electronic Copy of Complaint File. The matter was then assigned to another Equal Employment Opportunity Commission Administrative Judge (AJ). Over the Agency's objections, on February 6, 2020, the AJ granted Complainant's March 21, 2016, motion for sanction of default judgment for the Agency's violation of 29 C.F.R. § 1614.108(f) which requires an Agency to provide a Complainant with the investigative file within 30 days of receiving the investigative file.[2]

The AJ found that the extreme length of the Agency's delay, the harm the delay caused the Complainant, and the Agency's disregard for the EEO process warranted sanctions in the form of a default judgment. See Order Granting Complainant's Motion for Sanction of Default Judgment (Default Judgment Order). The AJ also found that Complainant established a prima facie case of discrimination due to her disability when, shortly after she informed her supervisor, the Director of the Public Health Law Program (Director), of her epilepsy, he hired someone to replace Complainant while she was on medical leave, then demoted Complainant, taking away her role as a project manager, and ultimately terminated her, even though he had not previously indicated there was anything wrong with her performance. See Default Judgment Order. The AJ therefore granted Complainant's motion for default judgment against the Agency and found the Agency liable for damages, giving the parties thirty (30) days to engage in discovery concerning Complainant's damages. See Default Judgment Order.

Complainant filed a motion seeking damages including reinstatement into a substantially similar position, back pay, non-pecuniary compensatory damages in the amount of $300,000, pecuniary compensatory damages, as well as discipline and training for Director. The Agency objected to Complainant's request for damages. On June 8, 2020, the AJ issued a Damages Decision, awarding Complainant non-pecuniary compensatory damages of $42,500, backpay for the months remaining on her employment contract with ORISE at the time of her termination, and attorney's fees in the amount of $41,834 to Complainant's current counsel and $1,193.50 to Complainant's prior counsel. The AJ did not address Complainant's request seeking to have the Agency be required to provide training and/or discipline to Director or to post a notice on the finding. The AJ also did not address Complainant's request for pecuniary, compensatory damages.

---

[2] Complainant also filed a motion to reinstate her retaliation claim, which the AJ granted. See Feb. 6, 2020 Default Judgment Order.

When the Agency failed to issue a final order within forty days of receipt of the AJ's decision, the AJ's decision on damages became the Agency's final action pursuant to 29 C.F.R. § 1614.109(i).

## CONTENTIONS ON APPEAL

On appeal, Complainant argues the AJ erred by failing to order reinstatement and other equitable relief, including requiring the Agency to post a notice and ordering training and/or discipline for Director. Complainant also challenges the amount of non-pecuniary compensatory damages the AJ ordered and contends the AJ erred by failing to address Complainant's request for pecuniary compensatory damages at all. Complainant further argues the AJ abused her discretion by limiting the time frame for discovery of damages because it did not give Complainant sufficient time to collect medical records from her providers in ▊▊▊▊▊▊▊, especially in light of the Covid-19 pandemic.

The Agency filed a response, contending the AJ correctly found Complainant was not entitled to reinstatement and also that the AJ's award of non-pecuniary, compensatory damages was sufficient.

## ANALYSIS AND FINDINGS

We note at the outset that the parties do not contest the AJ's issuance of the default judgment. The only issues before us on appeal concern the AJ's award of remedies.

When discrimination is found, an agency must provide a complainant with a remedy that constitutes full, make-whole relief to restore the complainant as nearly as possible to the position she would have occupied absent the discrimination. See, e.g., Franks v. Bowman Transp. Co., 424 U.S. 747, 764 (1976); Albemarle Paper Co. v. Moody, 422 U.S. 405, 418-19 (1975); Lazaro G. v. Dep't of Com., EEOC Appeal No. 0120170802 (May 17, 2019), req. for recon. den'd EEOC Request No. 2019004115 (Sept. 17, 2019); Adesanya v. U.S. Postal Serv., EEOC Appeal No. 01933395 (July 21, 1994). It must therefore provide a remedy unless it can show, by clear and convincing evidence, that Complainant would not have been entitled to that remedy even absent discrimination. Brown v. Dep't of the Navy, EEOC Petition No. 0420120012 (June 5, 2013) (citing Davis v. Dep't of Justice, EEOC Request No. 05931205 (Sept. 1, 1994)); Day v. Matthews, 530 F.2d 1083, 1085 (D.C. Cir. 1976)); see also 29 C.F.R. § 1614.501(c)(2).

*Reinstatement*

We note that as a general rule, reinstatement to Complainant's previous position or a substantially similar one is the preferred remedy in a case involving discriminatory discharge, unless the Agency can meet its burden of showing that reinstatement is inappropriate. See Struppler v. U.S. Postal Serv., EEOC Appeal No. 0120111119 (June 28, 2013); Romero v. Dep't of the Air Force, EEOC Appeal No. 01921636 (July 13, 1992).

4                                                                2020004613

In this case, we find that the AJ correctly found that the Agency met its burden of showing that reinstatement is an inappropriate remedy in this case. The AJ emphasized that Complainant was not an Agency employee, but rather was employed in a fellowship position with a term employment contract that contained a date certain on which her employment with ORISE would end. The AJ also found that Complainant was no longer eligible to participate in the ORISE fellowship program as the program she worked within has concluded. The evidence in the record indicates that the ORISE program was a training and succession planning mechanism and participation in the program is limited to those who are "enrolled in an accredited college or university, received a college degree within five years of the initial ORISE appointment date or serve as a full time faculty member at an accredited college or university." See Report of Investigation (ROI) at 293, 299. The ORISE program description also stated that the initial term appointment was for no more than one year with subsequent extensions in one-year intervals and that participation in the program was limited to no more than four years. See ROI at 299.

Further, contrary to Complainant's contention, we do not find that the evidence in the record supports her contention that absent the Agency's discriminatory termination, she would have been converted to a full-time Agency employee. Rather, the evidence Complainant submitted of some of the other members of the ORISE fellowship indicate that while some were indeed later employed by the Agency, there is nothing in the record to indicate that this was an automatic conversion upon the end of the ORISE fellowship term as opposed to the result of the normal job search process. The Agency submitted an affidavit from a former ORISE fellow, who affirmed that all fellows were told that there was no right to future employment or a federal position and that he only became an Agency employee after approximately three years of working in different contractor positions immediately following the end of his ORISE fellowship term. See Agency Brief on Damages Ex. 8. We therefore affirm the AJ's finding that Complainant is not entitled to reinstatement.

*Backpay*

The purpose of a backpay award is to restore to Complainant the income she would have otherwise earned but for the discrimination. See Albemarle Paper Co.; Davis v. U.S. Postal Serv., EEOC Petition No. 04900010 (Nov. 29, 1990). The Commission recognizes that precise measurement cannot always be used to remedy the wrong inflicted and that the computation of back pay awards inherently involves some speculation. Hanns v. U.S. Postal Serv., EEOC Petition No. 04960030 (Sept. 18, 1997). Nonetheless, uncertainties involved in a backpay determination should be resolved against the Agency, which has already been found to have committed the acts of discrimination. Id.; see also Kloock v. U.S. Postal Serv., EEOC Petition No. 04A40012 (June 16, 2004).

In this case, the AJ awarded Complainant back pay for the months remaining on her employment contract with ORISE at the time of her termination for a total of $37,947 in back pay plus interest. Because we find that Complainant is not entitled to reinstatement, we affirm the AJ's award of back pay limited to the monthly stipend Complainant would have received absent the Agency's discrimination for the months remaining on her employment contract.

*Non-pecuniary, Compensatory Damages*

Pursuant to section 102(a) of the Civil Rights Act of 1991, a complainant who establishes unlawful intentional discrimination under either Title VII or the Rehabilitation Act may receive compensatory damages for past and future pecuniary losses (i.e., out-of-pocket expenses) and non-pecuniary losses (e.g., pain and suffering, mental anguish) as part of this "make whole" relief. 42 U.S.C. § 1981a(b)(3). In West v. Gibson, 119 S.Ct. 1906 (1999), the Supreme Court held that Congress afforded the Commission the authority to award compensatory damages in the administrative process. For an employer with more than 500 employees, such as the agency, the limit of liability for future pecuniary and non-pecuniary damages is $300,000. 42 U.S.C. § 1981a(b)(3).

Non-pecuniary losses are losses that are not subject to precise quantification, i.e., emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, injury to professional standing, injury to character and reputation, injury to credit standing, and loss of health. See Enforcement Guidance on Compensatory and Punitive Damages Available Under Section 102 of the Civil Rights Act of 1991, EEOC Notice No. 915.302, at 10 (July 14, 1992). There is no precise formula for determining the amount of damages for non-pecuniary losses except that the award should reflect the nature and severity of the harm, and the duration or expected duration of the harm. See Loving v. Dep't of the Treasury, EEOC Appeal No. 01955789 (Aug. 29, 1997). The Commission notes that non-pecuniary compensatory damages are designed to remedy the harm caused by the discriminatory event rather than to punish the Agency for the discriminatory action. Furthermore, compensatory damages should not be motivated by passion or prejudice or be "monstrously excessive" standing alone but should be consistent with the amounts awarded in similar cases. See Ward-Jenkins v. Dep't of the Interior, EEOC Appeal No. 01961483 (Mar. 4, 1999).

Evidence from a health care provider or other expert is not a mandatory prerequisite for recovery of compensatory damages for emotional harm. See Lawrence v. U.S. Postal Serv., EEOC Appeal No. 01952288 (Apr. 18, 1996) (citing Carle v. Dep't of the Navy, EEOC Appeal No. 01922369 (Jan. 5, 1993)). Objective evidence of compensatory damages can include statements from Complainant concerning his emotional pain or suffering, inconvenience, mental anguish, loss of enjoyment of life, injury to professional standing, injury to character or reputation, injury to credit standing, loss of health, and any other non-pecuniary losses that are incurred as a result of the discriminatory conduct. Id.

Statements from others including family members, friends, health care providers, other counselors (including clergy) could address the outward manifestations or physical consequences of emotional distress, including sleeplessness, anxiety, stress, depression, marital strain, humiliation, emotional distress, loss of self-esteem, excessive fatigue, or a nervous breakdown. Id. Complainant's own testimony, along with the circumstances of a particular case, can suffice to sustain her burden in this regard. Id.

The more inherently degrading or humiliating the defendant's action is, the more reasonable it is to infer that a person would suffer humiliation or distress from that action. Id. The absence of supporting evidence, however, may affect the amount of damages appropriate in specific cases. Id.

An award of non-pecuniary, compensatory damages should reflect the extent to which the Agency's discriminatory action directly or proximately caused the harm, as well as the extent to which other factors also caused the harm. See Johnson v. Dep't of the Interior, EEOC Appeal No. 01961812 (June 18, 1998). It is the complainant's burden to provide objective evidence in support of her claim and proof linking the damages to the alleged discrimination. Papas v. U.S. Postal Serv., EEOC Appeal No. 01930547 (Mar. 17, 1994); Mims v. Dep't of the Navy, EEOC Appeal No. 01933956 (Nov. 23, 1993).

On appeal, Complainant contends that the AJ's award of $42,500 in non-pecuniary, compensatory damages is insufficient to account for the scope and duration of the harm the Agency's actions caused her, including the exacerbation of her physical medical conditions due to stress, substantial weight gain, harm to her professional and social standing, depression, a chronic sleeping disorder, and loss of social life and friendships. We find that the AJ appropriately determined that Complainant is entitled to some amount of non-pecuniary, compensatory damages due to the depression and other emotional harms she suffered, panic attacks, severe stress resulting in physical pain, as well as her loss of enjoyment of life and social withdrawal.

However, upon review of the record and similar Commission decisions, we find that a non-pecuniary, compensatory damages award of $75,000.00 is more appropriate. The record included an email exchange between Complainant and one of her law school professors and mentors about her job search following her termination, in which her former professor retracted his earlier offer to speak with her about her job search stating he had spoken with Director and "[h]e actually brought up the topic of you. He mentioned that you were in litigation, so I don't want to interpose [sic] myself any further in this." See ROI at 239. At the hearing on damages, Complainant testified that since then, her former professor has not been willing to help her with her job search. See Damages Hr'g Tr. at 75. Complainant also stated that after the termination, she started having panic attacks, cried a lot, experienced physical pain which her doctors told her was the result of severe stress, as well as depression. See Damages Hr'g Tr. at 123-28. She further testified that she used to be very active socially but since the termination, stopped going to social events entirely due to feelings of embarrassment and humiliation stemming from the loss of her job, and that as a result of her withdrawal, she lost friends. See id. at 139-42. One of Complainant's friends also testified and confirmed that Complainant withdrew socially, stopped accepting invitations, and that her outlook on life became more hopeless. See Damages Hr'g Tr. at 227-30. Complainant also submitted a neuropsychological evaluation from a neuropsychologist diagnosing her with mild anxiety and moderate depression which he attributed to her unemployment situation.

We find that an award of non-pecuniary damages of $75,000 is more appropriate in this case, taking into account the severity of the harm that Complainant suffered, and is consistent with prior Commission precedent.   We also find that an award of $75,000 is not "monstrously excessive" standing alone, is not the product of passion or prejudice, and is consistent with the amount awarded in similar cases. See Rebecca L. v. Dep't of the Treasury, EEOC Appeal No. 2021001759 (Nov. 4, 2021) (affirming an AJ's award of $75,000 where the agency's denial of reasonable accommodation and harassment led Complainant to experience sleeplessness, loss of appetite, isolation, and fear of sharing her medical condition with others); Hayden R. v. U.S. Postal Serv., EEOC Appeal No. 2019003428 (Dec. 10, 2019) (finding an award of $75,000 was appropriate where the complainant suffered anxiety, exhaustion, fear, insomnia, post-traumatic stress disorder, depression, elevated blood pressure, marital stress, and humiliation; Kathleen P. v. Dep't of Homeland Sec., EEOC Appeal No. 0720150036 (Sept. 26, 2016) ($75,000 awarded where complainant experienced emotional distress, stress, and emotional disturbance over losing her livelihood).  We therefore modify the AJ's award of non-pecuniary, compensatory damages to award Complainant $75,000.

*Pecuniary Damages*

In a claim for pecuniary damages, a complainant must demonstrate, through appropriate evidence and documentation, the harm suffered because of the agency's discriminatory action. Objective evidence in support of a claim for pecuniary damages includes documentation showing actual out-of-pocket expenses with an explanation of the expenditure. The agency is only responsible for those damages that are clearly shown to be caused by the Agency's discriminatory conduct.   To recover damages, a complainant must prove that the employer's discriminatory actions were the cause of the pecuniary loss. Equal Employment Opportunity Management Directive for 29 C.F.R. Part 1614 (EEO MD-110), at Chap. 11, § VII.B.2.

Where, as here, the complainant, has a pre-existing condition that deteriorated as a result of the agency's discriminatory conduct, the agency is liable to the extent of the additional harm caused by the discrimination. EEOC Notice No. 915.002 at 11. Objective evidence of compensatory damages may include medical bills and statements from the complainant or others attesting to complainant's emotional suffering.

In this case, Complainant sought pecuniary, compensatory damages consisting of (1) $21,000 in student loan interest which she incurred as a result of losing her job; (2) $30,000 for Medicaid coverage in ▮▮▮▮▮▮ state where Complainant moved after the loss of her job, and $500 for medical expenses incurred while she was unemployed; (3) $700 for moving expenses; and (4) $2,500 for job search expenses.[3]  She also sought future, pecuniary damages in the amount of $13,000 for psychological counseling which she has not been able to afford.

---

[3] We note that a prevailing complainant is generally entitled to compensatory damages for loss of health insurance coverage by either: (1) reimbursing her for health insurance premiums paid to continue in an agency-sponsored insurance plan or to secure alternative coverage; or (2) paying

8                                                        2020004613

We find, however, that we will not address Complainant's entitlement to pecuniary damages because the AJ failed to address Complainant's request for pecuniary damages in any way in her Damages Decision. We therefore remand the case back to the Agency to return the case to the AJ for them to address Complainant's entitlement to pecuniary, compensatory damages in the first instance.

*Other Relief*

We further note that the AJ also did not address Complainant's request that the Agency be required to order training and/or discipline to Director and any other responsible management officials, as well as failing to order the Agency to post a notice about the finding of discrimination. As such, we modify the AJ's decision and provide additional orders for the Agency below.

We are troubled by the failure to require training and a notice of the finding in light of the AJ's finding in her Default Judgment Order that the Agency showed a "flagrant disregard for the EEO process," and a lack of good faith not only in failing to send Complainant the investigative file in a timely manner under 29 C.F.R. § 1614.108(f) but also in not providing any reason for its failure to comply with the previous AJ's order to deliver the investigative file. As such, we order the Agency to take steps to address to correct this situation.

<u>CONCLUSION</u>

Based on a thorough review of the record and the contentions on appeal, including those not specifically addressed herein, we AFFIRM the AJ's Damages Decision with respect to reinstatement and back pay, MODIFY the AJ's award of non-pecuniary, compensatory damages to award a total of $75,000, and REMAND the case to the Agency to forward the matter to the AJ in accordance with the ORDER below.

<u>ORDER</u> (D0617)

The Agency is ordered to take the following remedial actions:

1.  To the extent the Agency has not already done so, within 60 days of the date this Decision is issued, the Agency is ordered to pay Complainant back pay in the amount of $37,947, plus interest. If there is a dispute regarding the exact amount of back pay and/or benefits, the Agency shall issue payment to Complainant for the undisputed amount within 60 calendar days of the date the Agency determines the amount it believes to be due. Complainant may petition for enforcement or clarification of the amount in dispute regardless of whether she accepts the Agency's payment. The petition for clarification or

---

her for uninsured medical expenses incurred during the relevant period up to the amount the agency would have contributed to her health insurance premiums. See <u>Wrigley v. U.S. Postal Serv.</u>, EEOC Petition No. 04950005 (Feb. 15, 1996).

enforcement must be filed with the Compliance Officer, at the address referenced in the statement entitled "Implementation of the Commission's Decision."

2. The issue of Complainant's increased tax burden from the Agency's lump sum payment of back wages is remanded to the Agency. On remand, the Agency shall conduct a supplemental investigation, including providing Complainant an opportunity to submit evidence of her increased tax burden. The Agency shall complete the investigation and issue a final agency decision appealable to the EEOC determining the appropriate amount of damages.

3. To the extent the Agency has not already done so, within 60 days of the date this Decision is issued, the Agency is ordered to pay Complainant the amount of $41,834 and $1,193.50 in attorneys' fees and costs.

4. Within 60 days of the date this decision is issued, the Agency shall pay Complainant $75,000 in nonpecuniary, compensatory damages.

5. Within 120 days of the date this decision is issued, the Agency shall consider taking disciplinary action(s) against the management official(s) identified as being responsible for the unlawful discrimination perpetrated in this case. The Agency shall report its decision to the Commission. If the Agency decides to take disciplinary action, it shall identify the action taken. If the Agency decides not to take disciplinary action, it shall set forth the reason(s) for its decision not to impose discipline.

6. To the extent it has not already done so, within 90 days of the date this decision is issued, the Agency shall provide four (4) hours of live training with a focus on the Rehabilitation Act and reprisal to Director and other managers and supervisors of the Office of State Tribal Local and Territorial Support in Atlanta, Georgia.

7. Within sixty (60) calendar days after the date this decision becomes final, the Agency shall provide training to the responsible EEO management officials who processed this complaint on their responsibilities concerning case processing, sending the investigative file to Complainant in a timely manner, and their duty to comply with orders from the Commission.

8. The Agency shall, within 30 calendar days of the date this decision is issued, forward the matter to the EEOC's Atlanta District Office's Hearings Unit, so that the issues of Complainant's entitlement to pecuniary damages can be addressed by the AJ.

9. The Agency shall immediately post a notice in accordance with the paragraph below.

The Agency is further directed to submit a report of compliance in digital format as provided in the statement entitled "Implementation of the Commission's Decision." The report shall be submitted via the Federal Sector EEO Portal (FedSEP). See 29 C.F.R. § 1614.403(g).

10                                    2020004613

Further, the report must include supporting documentation of the Agency's calculation of back pay and other benefits due Complainant, including evidence that the corrective action has been implemented.

## POSTING ORDER (G0617)

The Agency is ordered to post at its facility at the Office of State Tribal Local and Territorial Support in Atlanta, Georgia, copies of the attached notice. Copies of the notice, after being signed by the Agency's duly authorized representative, shall be posted **both in hard copy and electronic format** by the Agency within 30 calendar days of the date this decision was issued, and shall remain posted for 60 consecutive days, in conspicuous places, including all places where notices to employees are customarily posted. The Agency shall take reasonable steps to ensure that said notices are not altered, defaced, or covered by any other material. The original signed notice is to be submitted to the Compliance Officer as directed in the paragraph entitled "Implementation of the Commission's Decision," within 10 calendar days of the expiration of the posting period. The report must be in digital format, and must be submitted via the Federal Sector EEO Portal (FedSEP). See 29 C.F.R. § 1614.403(g).

## ATTORNEY'S FEES (H1019)

If Complainant has been represented by an attorney (as defined by 29 C.F.R. § 1614.501(e)(1)(iii)), she/he is entitled to an award of reasonable attorney's fees incurred in the processing of the complaint. 29 C.F.R. § 1614.501(e). The award of attorney's fees shall be paid by the Agency. The attorney shall submit a verified statement of fees to the Agency -- **not** to the Equal Employment Opportunity Commission, Office of Federal Operations -- within thirty (30) calendar days of receipt of this decision. The Agency shall then process the claim for attorney's fees in accordance with 29 C.F.R. § 1614.501.

## IMPLEMENTATION OF THE COMMISSION'S DECISION (K0719)

Under 29 C.F.R. § 1614.405(c) and §1614.502, compliance with the Commission's corrective action is mandatory. Within seven (7) calendar days of the completion of each ordered corrective action, the Agency shall submit via the Federal Sector EEO Portal (FedSEP) supporting documents in the digital format required by the Commission, referencing the compliance docket number under which compliance was being monitored. Once all compliance is complete, the Agency shall submit via FedSEP a final compliance report in the digital format required by the Commission. See 29 C.F.R. § 1614.403(g). The Agency's final report must contain supporting documentation when previously not uploaded, and the Agency must send a copy of all submissions to the Complainant and his/her representative.

If the Agency does not comply with the Commission's order, the Complainant may petition the Commission for enforcement of the order. 29 C.F.R. § 1614.503(a). The Complainant also has the right to file a civil action to enforce compliance with the Commission's order prior to or following an administrative petition for enforcement. See 29 C.F.R. §§ 1614.407, 1614.408, and 29 C.F.R. § 1614.503(g).

Alternatively, the Complainant has the right to file a civil action on the underlying complaint in accordance with the paragraph below entitled "Right to File a Civil Action." 29 C.F.R. §§ 1614.407 and 1614.408. A civil action for enforcement or a civil action on the underlying complaint is subject to the deadline stated in 42 U.S.C. 2000e-16(c) (1994 & Supp. IV 1999). **If the Complainant files a civil action, the administrative processing of the complaint, including any petition for enforcement, will be terminated.** See 29 C.F.R. § 1614.409.

Failure by an agency to either file a compliance report or implement any of the orders set forth in this decision, without good cause shown, may result in the referral of this matter to the Office of Special Counsel pursuant to 29 C.F.R. § 1614.503(f) for enforcement by that agency.

STATEMENT OF RIGHTS - ON APPEAL
RECONSIDERATION (M0920)

The Commission may, in its discretion, reconsider this appellate decision if Complainant or the Agency submits a written request that contains arguments or evidence that tend to establish that:

1.  The appellate decision involved a clearly erroneous interpretation of material fact or law; or

2.  The appellate decision will have a substantial impact on the policies, practices, or operations of the agency.

Requests for reconsideration must be filed with EEOC's Office of Federal Operations (OFO) **within thirty (30) calendar days** of receipt of this decision. If the party requesting reconsideration elects to file a statement or brief in support of the request, **that statement or brief must be filed together with the request for reconsideration.** A party shall have **twenty (20) calendar days** from receipt of another party's request for reconsideration within which to submit a brief or statement in opposition. See 29 C.F.R. § 1614.405; Equal Employment Opportunity Management Directive for 29 C.F.R. Part 1614 (EEO MD-110), at Chap. 9 § VII.B (Aug. 5, 2015).

Complainant should submit his or her request for reconsideration, and any statement or brief in support of his or her request, via the EEOC Public Portal, which can be found at

https://publicportal.eeoc.gov/Portal/Login.aspx

Alternatively, Complainant can submit his or her request and arguments to the Director, Office of Federal Operations, Equal Employment Opportunity Commission, via regular mail addressed to P.O. Box 77960, Washington, DC 20013, or by certified mail addressed to 131 M Street, NE, Washington, DC 20507. In the absence of a legible postmark, a complainant's request to reconsider shall be deemed timely filed if OFO receives it by mail within five days of the expiration of the applicable filing period. See 29 C.F.R. § 1614.604.

An agency's request for reconsideration must be submitted in digital format via the EEOC's Federal Sector EEO Portal (FedSEP). See 29 C.F.R. § 1614.403(g).

12                                          2020004613

Either party's request and/or statement or brief in opposition must also include proof of service on the other party, unless Complainant files his or her request via the EEOC Public Portal, in which case no proof of service is required.

Failure to file within the 30-day time period will result in dismissal of the party's request for reconsideration as untimely, unless extenuating circumstances prevented the timely filing of the request. **Any supporting documentation must be submitted together with the request for reconsideration.** The Commission will consider requests for reconsideration filed after the deadline only in very limited circumstances. See 29 C.F.R. § 1614.604(c).

## COMPLAINANT'S RIGHT TO FILE A CIVIL ACTION (T0610)

This decision affirms the Agency's final decision/action in part, but it also requires the Agency to continue its administrative processing of a portion of your complaint. You have the right to file a civil action in an appropriate United States District Court **within ninety (90) calendar days** from the date that you receive this decision on both that portion of your complaint which the Commission has affirmed and that portion of the complaint which has been remanded for continued administrative processing. In the alternative, you may file a civil action **after one hundred and eighty (180) calendar days** of the date you filed your complaint with the Agency, or your appeal with the Commission, until such time as the Agency issues its final decision on your complaint. If you file a civil action, you must name as the defendant in the complaint the person who is the official Agency head or department head, identifying that person by his or her full name and official title. Failure to do so may result in the dismissal of your case in court. "Agency" or "department" means the national organization, and not the local office, facility or department in which you work. If you file a request to reconsider and also file a civil action, **filing a civil action will terminate the administrative processing of your complaint**.

## RIGHT TO REQUEST COUNSEL (Z0815)

If you want to file a civil action but cannot pay the fees, costs, or security to do so, you may request permission from the court to proceed with the civil action without paying these fees or costs. Similarly, if you cannot afford an attorney to represent you in the civil action, you may request the court to appoint an attorney for you. **You must submit the requests for waiver of court costs or appointment of an attorney directly to the court, not the Commission.** The court has the sole discretion to grant or deny these types of requests.

13                                                    2020004613

Such requests do not alter the time limits for filing a civil action (please read the paragraph titled Complainant's Right to File a Civil Action for the specific time limits).

FOR THE COMMISSION:

Carlton M. Hadden, Director
Office of Federal Operations

<u>August 29, 2022</u>
Date